# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**JENNY ST. GEORGE**
        **Plaintiff,**

    **v.**                              **Case No. 17-C-1150**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the Social Security Administration**
        **Defendant.**

---

## <u>DECISION ORDER</u>

In this action for judicial review, plaintiff Jenny St. George argues that an Administrative Law Judge ("ALJ") erred in denying her applications for social security disability benefits by failing to provide a sufficient explanation for discounting the medical opinions of her treating providers and her statements regarding the limiting effects of her symptoms. On review of the record and the submissions, I remand for further proceedings.

## I. FACTS AND BACKGROUND

### A.    Plaintiff's Application and Supporting Materials

Plaintiff applied for supplemental security income ("SSI") and disability insurance benefits ("DIB") in April 2013, alleging a disability onset date of September 30, 2008.[1] (Tr. at

---

[1]To be eligible for either DIB or SSI, the claimant must be "disabled," i.e., unable to engage in any substantial gainful activity by reason of any medically determinable impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. The difference between the two programs is that DIB is payable only if the claimant becomes disabled while in "insured status" based on previous earnings, while SSI is payable regardless of the claimant's insured status so long as she satisfies a means test. <u>Puchalski v. Colvin</u>, No. 14-C-869, 2015 U.S. Dist. LEXIS 37613, at *2-3 (E.D. Wis. Mar. 24, 2015), <u>aff'd</u>, 651 Fed. Appx. 535 (7th Cir. 2016). Here, plaintiff's insured status expired on September 30, 2013.

239, 242.)  In a work history report, plaintiff reported previous employment as a shoe stocker at Burlington Coat Factory from April 2012 to September 2012, a bartender at a tavern from December 2006 to September 2008, and a cashier at Walgreens from February 1999 to March 2006.  (Tr. at 270, 296.)  Plaintiff alleged that she could no longer work due to a variety of impairments, including gastrointestinal problems, a left foot/ankle injury, lumbar and cervical spine problems, lung nodules, dyspnea, bipolar disorder, and depression.  (Tr. at 294.)  She indicated that these impairments interfered with her ability to lift, walk, sit, stand, bend, reach, concentrate, and complete tasks.  (Tr. at 267.)  She reported that on a typical day she woke up, got her six and sixteen year old sons off to school, then went back to bed unless she had a doctor's appointment.  She tried to do some light cleaning, but her older son helped out a lot around the house.  (Tr. at 262.)  She further reported experiencing bad mood swings.  (Tr. at 268.)  Plaintiff's brother, Ian Hildreth, reported that he helped plaintiff with grocery shopping and around the house, and that she did not socialize with others.  (Tr. at 282-89.)

## B.    Agency Review

After plaintiff filed her applications, the agency arranged for a mental status evaluation with Christopher Ovide, Ed.D., on November 21, 2013.  (Tr. at 525.)  Dr. Ovide noted:

> On mental status exam, she was alert and oriented x3, had intact memory, was able to concentrate quite well, displayed the ability to think in an abstract manner, and to calculate adequately.  She reported significant symptoms of panic attack and depression but did not describe any symptoms of psychosis.  She did not endorse cardinal features of PTSD.  She did have a great deal of worry and loss of sleep over the nodules in her lungs, described being generally anxious and chronically worried about her finances and health and having specific panic symptoms about once a month.

(Tr. at 531.)  Dr. Ovide diagnosed anxiety disorder, NOS v. panic attack; cannabis abuse v. dependence; alcohol abuse v. dependence, reported to be in full remission; cocaine, ecstasy,

and LSD abuse, in full remission; personality disorder, NOS, with cluster B traits; and a GAF of 55.[2] (Tr. at 531.) He noted that: "Due to the combination of her medical and physical status, together with her long-standing personality disorder and moderate to high levels of anxiety and depression, her prognosis is guarded at best." (Tr. at 532.) In a statement of work capacity, Dr. Ovide indicated:

> Ms. St. George can be expected to have mild limitation in her ability to understand, remember, and carry out simple instructions. She may also have mild limitations in her ability to respond appropriately to supervisors and coworkers. Little to mild limitation in her ability to concentrate and attend to work instructions and work tasks are likely. However, marked limitations can be expected in her ability to work at any type of reasonable pace. She will have severe limitations in her ability to withstand routine work stress and to adapt to any changes in her work environment or routine.

(Tr. at 532.)

The agency denied the application initially on December 3, 2013 (Tr. at 165), based on the review of Dimitri Teague, M.D., who concluded that plaintiff could perform light work with occasional use of her left leg for pushing/pulling or operating foot controls; occasional climbing of ramps/stairs; never climbing ladders/ropes/scaffolds; frequent balancing; occasional stooping, kneeling, crouching, and crawling; avoiding concentrated exposure to fumes, odors, dusts, etc., and avoiding all exposure to hazards (machinery, heights, etc.) (Tr. at 91-92) and

---

[2]GAF ("Global Assessment of Functioning") rates the severity of a person's symptoms and her overall level of functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting herself or others. Scores of 81-90 reflect "minimal" symptoms, 71-80 "transient" symptoms, 61-70 "mild" symptoms, 51-60 "moderate" symptoms, 41-50 "severe" symptoms, 31-40 some impairment in reality testing, 21-30 behavior considerably influenced by delusions or hallucinations, and 11-20 some danger of hurting self or others. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000). The fifth edition of the DSM, published in 2013, abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." Williams v. Colvin, 757 F.3d 610, 613 (7th Cir. 2014).

David Biscardi, Ph.D., who concluded that plaintiff retained the capacity to understand, remember, carry out, and sustain performance of one to three step tasks (but would become overwhelmed if the procedures were more complicated), complete a normal workday, interact with co-workers/supervisors, and adapt to changes/stressors associated with simple, routine competitive activities. (Tr. at 94).

Plaintiff requested reconsideration (Tr. at 170), but the agency maintained the denial on May 30, 2014 (Tr. at 173) based on the review of Neal Bente, M.D., who concluded that plaintiff could perform light work, with a number of additional postural and environmental limitations (Tr. at 129-31) and Ellen Rozenfeld, Psy.D., who agreed with Dr. Biscardi's evaluation (Tr. at 133). Plaintiff then requested a hearing before an ALJ. (Tr. at 185.)

## C.    Treating Provider Reports

Prior to the hearing, plaintiff submitted several reports from her treating providers, which endorsed a number of significant – and, at times, divergent – limitations on her ability to sustain work.  On September 11, 2014, Dr. Matthew Schubert, plaintiff's primary care physician, prepared a report in which he indicated that he had treated plaintiff since September 24, 2013, and listed diagnoses of anxiety and bipolar disorder; chronic back, neck, and ankle pain; COPD; depression; and panic attacks.  Her prognosis was "fair pending treatment." (Tr. at 942.)  He indicated that her symptoms began "well before [he] knew her." (Tr. at 943.)  He recommended "no physical activities" and a "stress free work place." (Tr. at 943.) He indicated that she could occasionally lift 10 pounds, never more; stand/walk no more than two hours in an eight hour day and continuously walk two to four blocks; and sit with no limitation. (Tr. at 943.)  He further indicated that she could rarely move her neck, stoop, crouch, or climb.  She could frequently use her hands and fingers, but rarely reach with her arms.  He further

4

indicated that her symptoms would frequently interfere with the performance of simple work tasks. Her impairments also produced "bad days" such that she would likely be absent from work more than three times per month. Her medications did not cause side effects affecting her ability to work. (Tr. at 944.) He estimated that she could participate in work or work readiness activities one to two hours per day. (Tr. at 945.)

On September 18, 2014, Dr. Florin Stuleanu, plaintiff's pulmonologist, completed a report, listing a diagnosis of COPD with a fair prognosis. (Tr. at 1566.) He indicated that plaintiff could occasionally lift 20 pounds, frequently 10; stand and walk no more than six hours in an eight-hour day; and sit no more than two hours in a day. (Tr. at 1567.) She could frequently move her neck and engage in postural movements. She had no significant limitations with handing, fingering, and reaching. Her symptoms would rarely interfere with the performance of simple work tasks. Her impairments did produce bad days, and she would likely be absent from work about twice per month. Her medications did not cause side effects. (Tr. at 1568.) Dr. Stuleanu thought plaintiff could engage in work activities six hours per day. (Tr. at 1569.)

On November 17, 2014, Dr. Vijay Khiani, a GI specialist, completed a medical source statement. (Tr. at 1453.) Dr. Khiani indicated that he first saw plaintiff on September 29, 2014 and listed a diagnosis of Crohn's disease, with a prognosis "TBD." (Tr. at 1450.) He identified symptoms of abdominal pain and cramping, weight loss, nausea, fatigue, change in bowel habits, gas, and bloating. He indicated that plaintiff experienced right sided mid and lower abdominal pain, sharp pressure, and cramping. He further identified clinical findings and objective signs from an MRI, Prometheus panel, and colonoscopy. (Tr. at 1450.) He found it difficult to assess her ability to sit, stand, and walk, noting they were trying to treat her

5

significant abdominal pain related to inflammation. She would need a job that permits ready access to a restroom, up to several times per day. (Tr. at 1451.) He further indicated that she would sometimes need to lie down or rest at unpredictable intervals during a working day; how often was unclear. He stated that she should avoid heavy lifting but did not provide specific figures. He also crossed out the questions regarding time off task, work stress, and absences. (Tr. at 1452.)

On February 10, 2015, Dr. Schubert prepared a letter stating:

Due to chronic medical illnesses including Crohn's disease and endometriosis, [plaintiff] suffers from severe chronic abdominal pain.

It is my medical opinion that [plaintiff] should not be allowed to work in any capacity due to the amount of pain she is in daily. I believe her medical situation should be assessed next in six months.

(Tr. at 755.) On August 31, 2015, Dr. Schubert prepared another letter saying the same thing. (Tr. at 771.)

On September 4, 2015, Dr. Srihari Ramanujam, plaintiff's gastroenterologist, prepared a report listing a diagnosis of Crohn's disease. For a prognosis, he indicated the disease was chronic, with periodic flares. (Tr. at 773.) He wrote that her symptoms began August 2014. She was currently on a biologic medication – Remicade – and they were hoping for control of inflammation, although she may have continued symptoms. (Tr. at 774.) Asked to assess her physical abilities (lifting, standing/walking, sitting, using arms and hands), he wrote "N/A." (Tr. at 774-75.) He did check "frequently" when asked how often her symptoms would interfere with the ability to perform simple work tasks. He also indicated that her impairment would produce good and bad days, and more than three absences per month. (Tr. at 775.) Asked how many hours per day she could work, he wrote: "Hard to say – need to clarify with other medical

6

providers for her other conditions." (Tr. at 776.) At the end of the report, he added: "Please note that [a] majority of these questions cannot be addressed by our GI specialty. This patient has <u>other</u> medical issues that may interfere with her work & daily activities more than the Crohn's disease." (Tr. at 777.)

On February 15, 2016, Dr. Schubert prepared another report, listing impairments of chronic neck, back, ankle, and abdominal pain; Crohn's disease; and chronic obstructive lung disease. (Tr. at 1128.) In this report, he indicated that plaintiff could occasionally lift five pounds or less, stand/walk less than one hour in an eight-hour workday (and just five minutes at a time), sit without limitation, and never engage in postural movements (e.g., climbing, kneeling, crouching, crawling). (Tr. at 1127-28.) She could occasionally reach with both arms, and frequently use her hands and fingers. He attributed these limitations to chronic back pain. (Tr. at 1129.) He also identified environmental limitations of temperature extremes, noise, vibration, and hazards (machinery, heights), stating that "heat or cold affect her joints – pain." (Tr. at 1129.) He concluded that this assessment applied to the time period of February 15, 2016 to August 15, 2016. (Tr. at 1129.)

On March 2, 2016, Cynthia Koopmeiners, PA-C, who worked with Dr. Ramanujam, prepared a medical source statement, listing diagnoses of Crohn's-mild and abdominal pain (not related to Crohn's). She listed symptoms of abdominal pain and cramping, weight loss, vomiting, and nausea. (Tr. at 1584.) She indicated that plaintiff needed a job that permits ready access to a bathroom, and that plaintiff would need to take unscheduled breaks of 30 minutes' duration three times per day; the need for such breaks could be sudden. Koopmeiners further indicated that plaintiff would need to lie down two to four times per day, for one to two hours. She would be off task 25% or more of the time due to her symptoms and

7

was incapable of even low stress work, as stress would cause a flare of symptoms. (Tr. at 1585.) Plaintiff would also have good and bad days, and would likely be absent more than four days per month. (Tr. at 1586.)

Finally, on March 9, 2016, Dr. Schubert prepared a letter stating:

Due to chronic medical illnesses including Crohn's disease and endometriosis, [plaintiff] suffers from severe chronic abdominal and pelvic pain. The patient's pain and nausea has resulted in multiple hospitalizations. She becomes completely incapacitated when she is having a flare. At those times she needs to be admitted for hydration purposes, nausea, and pain control.

On a daily basis, she also suffers from chronic abdominal pain. She is currently seeing a gastroenterologist as well for her chronic medical conditions. Regarding the patient's endometriosis, she has been worked up by gynecology for this. This also causes chronic pelvic and abdominal pain. On a daily basis, the patient has significant abdominal pain which becomes severe on an intermittent basis as well. She is on prescription pain medication for the above.

Due to the above illnesses, it is my medical opinion that [plaintiff] should not be allowed to work in any capacity due to the amount of pain she is in daily. Also, she would not be able to be employed on a regular basis because of the recurring flares which require doctors' visits and hospitalizations. She would need to miss work quite often for these episodes. I believe her medical situation should be reassessed next in 6 months.

(Tr. at 1588.)

## D. Hearing

On March 17, 2016, plaintiff appeared with a non-attorney representative for her hearing before the ALJ. The ALJ also summoned a vocational expert ("VE") to testify. (Tr. at 45-47.)

Plaintiff testified that she was 37 years old and lived with her two sons, then ages 19 and eight. (Tr. at 52.) She dropped out of school after the tenth grade because she was pregnant and had not obtained a GED. (Tr. at 53.) She stood 5'2" and weighed 122 pounds, down about 30 pounds over the past year. She last worked part-time at Burlington Coat Factory. (Tr. at 54.) She left that job because the lifting was too much for her back. She had not looked for

work since then due to her illnesses.  (Tr. at 55.)  She testified to previous employment at Walgreen's as a cashier and in the photography department (Tr. at 62-63), as a part-time bartender (Tr. at 63), and watching children at a school during recess (Tr. at 64).

Plaintiff testified that on a typical day she woke up and sat on the side of her bed, took medications for pain, then laid back down and waited for the pills to kick in before getting out of bed and starting her day.  She testified that she had more bad days than good, where she would stay in bed curled up in pain.  On a good day, she could do some light chores, although her sons did most of the work for her.  (Tr. at 55.)  She stayed in her pajamas a good portion of the time she was at home, unless she had a doctor's appointment, then she got dressed.  She primarily made microwave meals or ordered out; she cooked about once per week.  She could do some dishes, although standing caused pain; her older son helped a lot with that.  Her older son also did the laundry.  Her sons did the vacuuming and sweeping.  Once per month she grocery shopped with her older son.  (Tr. at 56.)  She testified that she had been unable to do these types of daily activities for the last two years.  (Tr. at 56-57.)  She later testified that she sometimes played catch with her son.  (Tr. at 66.)

Plaintiff testified that she constantly experienced pain in her stomach, through to her back.  Sitting or laying down a certain way aggravated the pain.  She used a heating pad or an ice pack to try to alleviate the pain.  She also took medications, which caused side effects of dizziness, shakiness, and fatigue.  She was in pain all day, every day.  (Tr. at 57.)  About twice per month she experienced a flare where she would repeatedly throw up, requiring a trip to the hospital.  (Tr. at 57-58.)  She later indicated that she had been hospitalized in November, December, and February.  (Tr. at 67-68.)

Plaintiff testified that she had the abdominal pain for about two years; her doctors were

uncertain of the cause; they did not think it was caused by her Crohn's disease alone. (Tr. at 66.) Plaintiff testified that she got about four to six hours of sleep per night, tossing and turning due to pain; she napped during the day. She also experienced migraine headaches about three times per month, for which she took medication. (Tr. at 58, 73-74.)

Plaintiff testified that she did not try to lift anything because of pain. Sitting also caused pain, so she leaned to the side. (Tr. at 58.) She walked with a slight limp due to her ankle. (Tr. at 59.) She lacked mobility and experienced pain if she moved in a certain way. Other than wearing a brace, she had not received any treatment for her ankle for several years. (Tr. at 73.)

Plaintiff had good days and bad days with her breathing depending on the weather; she had two inhalers for that. Exposure to dust caused her to break out in hives; she had an Epipen for that. She also saw a psychiatrist and took the medications Alprazolam and Amitriptyline. (Tr. at 59.) She later testified that she saw a psychiatrist every three months, who gave her Alprazolam. She had not seen any counselors or therapists in the past year. (Tr. at 69.) The medications were effective. (Tr. at 69.) She had previously seen a therapist every other week for about a year. (Tr. at 70.) She saw Dr. Shubert, her primary physician for about three years, two to three times per month. (Tr. at 71.)

Plaintiff had never driven; he son drove her. (Tr. at 61-62.) Before he started driving, she took the bus. (Tr. at 62.) She had a tablet device, which she used to pay bills on line, play games, and look things up on the internet. (Tr. at 72-73.) She denied having trouble getting along with others but indicated that she mostly kept to herself; she dropped her old friends due to her past drug problem. (Tr. at 74.) She denied having trouble interacting with people socially but did allege trouble concentrating, which she attributed to her medications. (Tr. at

10

74-75.)

The ALJ then turned to the VE, indicating that he found the cashier job at Walgreen's to be plaintiff's only past relevant work. The VE classified this job as light, SVP 3.[3] (Tr. at 76.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, capable of light work except the person could only occasionally push or pull or operate foot controls with the left lower extremity; could never climb ladders, ropes, or scaffolds; could frequently balance and occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; should avoid concentrated exposure to wetness, excessive vibration, and irritants; should avoid all exposure to hazards such as moving machinery and unprotected heights; limited to simple, routine, and repetitive tasks, and work in a low stress job defined as only occasional changes in the work setting. (Tr. at 76-77.) The VE responded that such a person could not perform plaintiff's past job, which would exceed simple, routine, and repetitive work. (Tr. at 77.) However, the person could do other jobs including housekeeper, laundry worker, and electronics assembler. (Tr. at 77.) Changing the exertional level to sedentary, the person could work as an order clerk, toy stuffer, and circuit board screener. (Tr. at 77-78.) Being off task 15% of the time or absent two or more days per month would eliminate all employment. (Tr. at 78.) If the person was limited to occasionally reaching or needed to take three unscheduled restroom breaks per day for 30 minutes, no jobs would be available. (Tr. at 79.)

---

[3]SVP ("Specific Vocational Preparation") refers to the amount of time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. SVP 3 covers jobs that require one to three months to learn, considered "semi-skilled" work. E.g., Balde v. Astrue, No. 10-C-0682, 2011 U.S. Dist. LEXIS 86352, at *15-16 n.6 (E.D. Wis. Aug. 4, 2011).

## E.    ALJ's Decision

On April 27, 2016, the ALJ issued an unfavorable decision. (Tr. at 18.) The ALJ noted that plaintiff met the insured status requirements through September 30, 2013. He further noted that she had not engaged substantial gainful activity since September 30, 2008, the alleged onset date. While she did some work after that date, her wages were not sufficient to reach the level of substantial gainful activity. (Tr. at 23.)

The ALJ next found that plaintiff suffered from the severe impairments of degenerative disc disease of the lumbar and cervical spine, asthma/chronic obstructive pulmonary disease ("COPD"), left ankle status post fracture and open reduction internal fixation, Crohn's disease/inflammatory bowel disease ("IBD"), gastroesophageal reflux disease ("GERD"), an affective disorder, and an anxiety disorder. (Tr. at 23-24.) Plaintiff reported suffering migraine headaches, but the ALJ found this condition non-severe as the record did not document significant treatment or significant, ongoing limitations, and plaintiff testified that medication helped. (Tr. at 24.) None of the severe impairments, the ALJ determined, qualified as conclusively disabling under the agency's Listing of impairments. (Tr. at 24-26.)

The ALJ then determined that plaintiff retained the RFC to perform light work, with no more than occasional pushing/pulling and operation of foot controls with the left lower extremity; never climbing ladders, ropes, or scaffolds; frequently balancing; occasionally climbing ramps and stairs, stooping, kneeling, crouching, and crawling; avoiding concentrated wetness, excessive vibration, and pulmonary irritants; avoiding all hazards; and limited to simple, routine, and repetitive tasks, and low stress work with only occasional workplace changes. In making this determination, the ALJ considered plaintiff's statements and the medical opinion evidence. (Tr. at 26.)

12

After acknowledging the two-step test for symptom evaluation set forth in the regulations (Tr. at 26-27), the ALJ summarized plaintiff's claims. Plaintiff complained of daily pain in the lower back, left ankle, and right buttock; stomach pain; and difficulty sleeping. She further alleged difficulties with a variety of functions, including lifting, squatting, bending, standing, reaching, walking sitting, kneeling, climbing, remembering, and concentrating. She also testified that she experienced side effects from her medications, including dizziness, shakiness, and tiredness. (Tr. at 27.)

The ALJ then stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause symptoms of the types alleged. However, the claimant's statements regarding the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. at 27.)

In support of this conclusion, the ALJ considered each of plaintiff's impairments and their associated symptoms. The record documented treatment for pain related to degenerative disc disease of the lumbar and cervical spine, including medications, injections, and chiropractic. (Tr. at 27.) However, x-rays and MRI scans revealed only mild abnormalities, and physical exams were often normal. (Tr. at 27-28.) Plaintiff also received medications for breathing problems, but respiratory exams were often normal, and she seemed to respond well to treatment. (Tr. at 28-29.) The record also documented an ankle fracture, for which she underwent surgery in September 2009. According to subsequent records, the fracture healed, with few residual symptoms; exams showed normal gait, strength, and range of motion; and plaintiff reported engaging in a variety of activities without any difficulty. Plaintiff did undergo

13

a follow procedure in April 2013 for removal of the hardware in the left ankle due to pain, but subsequent exams showed that the ankle healed uneventfully. (Tr. at 29.) Plaintiff had also been diagnosed with Crohn's disease/IBD, but in 2015 treating physicians noted the condition to be under excellent control or in remission, and that her abdominal pain was out of out of proportion to her symptoms. A January 2016 endoscopy revealed findings consistent with "very mild" Crohn's disease, and the physician reviewing the findings did not believe that her Crohn's disease accounted for her abdominal pain. (Tr. at 29.) Later that month, a treating physician noted that plaintiff did not have a firm diagnosis as to why she was having intermittent abdominal pain. In February 2016, a treating physician opined that plaintiff had mild Crohn's disease, which did not explain her abdominal pain. (Tr. at 30.) The record also documented a history of GERD, but this condition was well-controlled with medication. (Tr. at 30.) Finally, the record documented treatment for anxiety and depression with therapy and medications. However, mental status exams generally revealed normal memory, attention/concentration, insight and judgment. (Tr. at 30-31.)

The ALJ then turned to the opinion evidence, first from the agency consultants. The ALJ gave great weight to the opinions of the medical consultants, Drs. Teague and Bente, who concluded that plaintiff could perform a reduced range of light work. (Tr. at 31.) The ALJ noted that Drs. Teague and Bente had knowledge of social security disability programs, provided an adequate explanation for their opinions, and supported their opinions with relevant medical evidence from the record. He further found their opinions generally consistent with the overall record, which supported a range of light work. (Tr. at 31.)

The ALJ further noted that plaintiff's daily activities suggested a greater level of functioning than she had alleged. For example, in April 2013, plaintiff reported that she was

able to walk one to two miles, climb one flight of stairs, and could perform yard work, household cleaning, and grocery shopping. (Tr. at 32.)

The ALJ also gave great weight to the opinions of the psychological consultants, Drs. Biscardi and Rozenfeld, who found no more than moderate mental limitations. The ALJ noted that Drs. Biscardi and Rozenfeld also had knowledge of social security disability programs, provided an adequate explanation for their opinions, and supported their opinions with relevant medical evidence from the record. Additionally, their opinions were consistent with the record, which included multiple mental status exams revealing normal or largely normal findings. (Tr. at 32.)

The ALJ gave some weight to the opinions of consultative examiner Dr. Ovide, who found mild limitations in plaintiff's ability to carry out simple instructions, respond appropriately to supervisors and co-workers, and concentrate, but marked limitation in her ability to work at a reasonable pace and severe limitation in her ability to withstand routine work stress. The ALJ noted that Dr. Ovide had the opportunity to examine plaintiff and that the record generally supported the mild limitations he assessed. However, the more severe limitations in ability to work at a reasonable pace and withstand stress were not, the ALJ concluded, supported by the record, which suggested no more than moderate limitations and contained multiple mental status exams revealing normal or largely normal findings. (Tr. at 32.)

The ALJ then turned to the opinions of the treating sources. He first summarized the various reports from Dr. Schubert, plaintiff's family medicine physician. (Tr. at 32-33.) The ALJ noted that Dr. Schubert had a treating relationship with plaintiff but found that his opinions were not entitled to controlling weight; he instead have them little weight. The ALJ found that Dr. Schubert's opinions were not well supported by the record as a whole. For example, Dr.

Schubert repeatedly opined that plaintiff could not work due to abdominal/pelvic pain caused by Crohn's disease and/or endometriosis.  However, a January 5, 2016 endoscopy revealed "very mild" Crohn's disease, and the reviewing physician did not believe that plaintiff's Crohn's disease accounted for her abdominal pain.  Also, on January 25, 2016, Dr. Schubert noted that plaintiff did not have a firm diagnosis as to why she was having chronic intermittent abdominal pain, and her gastroenterologist did not believe that her Crohn's disease was the "complete culprit" of all of her pain.  In addition, the record did not document a definitive diagnosis of endometriosis.  For example, on April 22, 2015, the treating physician noted that plaintiff had suspected endometriosis, and on August 31, 2015, Dr. Schubert noted that plaintiff had "presumed" endometriosis.  Finally, the ALJ found that the significant limitations Dr. Schubert assessed in September 2014 and February 2016 were not consistent with the overall record; rather, the overall record supported a range of light work, consistent with the opinions of Drs. Teague and Bente.  (Tr. at 33.)

The ALJ also considered the opinion of Dr. Ramanujam, a treating gastroenterologist, who in September 2015 opined that plaintiff's Crohn's disease and GI issues would result in symptoms that would frequently interfere with plaintiff's performance of simple work tasks and would cause more than three absences per month, but that she would not have any other functional limitations.  Although Dr. Ramanujam had a treating relationship with plaintiff, the ALJ gave his opinion only some weight, as the record did not support the limitations he imposed.  For example, on April 24, 2015, Dr. Ramanujam noted that plaintiff's Crohn's disease was under "excellent control" and his assessment was that it was stable and in remission.  (Tr. at 33.)  Also, the January 5, 2016, endoscopy revealed findings consistent with "very mild" Crohn's disease, and Dr. Ramanujam did not believe that plaintiff's Crohn's disease accounted

for her abdominal pain. (Tr. at 33-34.) Therefore, Dr. Ramanujam's own treatment notes did not support his opinion that plaintiff's GI symptoms would frequently interfere with her performance of simple tasks or result in her being absent more than three times per month. However, the same evidence did support Dr. Ramanujam's opinion that plaintiff's Crohn's disease and GI issues had not resulted in any other significant functional limitations. (Tr. at 34.)

The ALJ further considered the opinion of Dr. Kiahni, who indicated in November 2014 that plaintiff had significant abdominal pain related to inflammation, and that it was difficult to assess her functional limitations. Dr. Kiahni further indicated that plaintiff would need to take unscheduled restroom breaks up to several times per day, she would sometimes need to lie down or rest at unpredictable intervals during a workday, and she should avoid heavy lifting. The ALJ gave little weight to this opinion. At the time he assessed plaintiff's functioning, Dr. Kiahni had been treating her for less than two months. In addition, his credentials were not clear from the medical source statement he completed. Dr. Kiahni also stated that it was "difficult" to assess plaintiff's functioning and did not complete much of the functional assessment form. (Tr. at 34.)

The ALJ also considered the opinion of treating pulmonologist, Dr. Stuleanu, who in September 2014 generally indicated that plaintiff could handle light work but indicated that she would be absent from work an average of about twice per month and could perform work or work-readiness activities for six hours per day, five days per week. The ALJ gave little weight to Dr. Stuleanu's opinion. Although Dr. Stuleanu had a treating relationship with plaintiff, he was a pulmonologist and only treated her COPD/asthma, and the record documented that her COPD/asthma did not result in significant limitations. In particular, pulmonary function tests

17

in September 2014 and December 2014 revealed normal results. Therefore, the ALJ concluded that plaintiff's COPD/asthma would not result in two absences per month or a limitation to part-time work. (Tr. at 34.)

Finally, the ALJ considered the March 2016 opinion of the treating physician's assistant, Cynthia Koopmeiners. The ALJ gave little weight to PA Koopmeiners's opinion, as she did not provide an adequate explanation for the significant limitations she assessed. In addition, her opinion was not consistent with the medical evidence in the record. For example, on April 24, 2015, Dr. Ramanujam noted that plaintiff's Crohn's disease was under "excellent control," and his assessment was that it was stable and in remission. (Tr. at 34.) Also, on January 5, 2016, an endoscopy revealed findings that were consistent with "very mild" Crohn's disease. (Tr. at 34-35.) Further, Koopmeiners's opinion was inconsistent with the opinion of Dr. Ramanujam, who was more qualified to render an opinion on plaintiff's GI issues as a medical doctor and gastroenterologist. (Tr. at 35.)

The ALJ also considered the third-party function report completed by plaintiff's brother, Mr. Hildreth. His allegations regarding plaintiff's functioning were similar to her's. However, in some instances, he indicated that she could do less than she had alleged. For example, Hildreth reported that plaintiff did not spend time with others, whereas plaintiff reported that she did spend time with others. As a result, the ALJ found that his allegations were not an entirely reliable reflection of plaintiff's functional abilities. (Tr. at 35.)

In sum, the ALJ found the RFC supported by the overall record; the reliable opinions from Drs. Teague, Bente, Biscardi, and Rozenfeld; and plaintiff's reported activities. Based on this RFC, the ALJ determined that plaintiff could not perform her past relevant work as a cashier. (Tr. at 35.) However, he concluded that she could do a number of other jobs, as

identified by the VE, including housekeeper, laundry worker, and assembler. He accordingly found her not disabled. (Tr. at 36.)

On June 19, 2017, the Appeals Council denied review (Tr. at 1), making the ALJ's decision the final word from the agency on plaintiff's application. Moreno v. Berryhill, 882 F.3d 722, 728 (7th Cir. 2018). This action followed.

## II. STANDARD OF REVIEW

The court will reverse an ALJ's decision if it is not supported by substantial evidence or if it is the result of an error of law. Stephens v. Berryhill, 888 F.3d 323, 327 (7th Cir. 2018). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. In addition to relying on substantial evidence, the ALJ must build a logical bridge from the evidence to his conclusion. Id. The court may not substitute its own judgment for that of the ALJ by reevaluating the facts or re-weighing the evidence, but this deferential standard does not mean the court acts as a rubber-stamp. Id.

## III. DISCUSSION

### A. Treating Provider Reports

Under the regulations applicable to plaintiff's claim, a treating physician's opinion on the nature and severity of a claimant's medical condition "is entitled to controlling weight if it is well supported by medical findings and consistent with other record evidence." Lambert v. Berryhill, 896 F.3d 768, 2018 U.S. App. LEXIS 20040, at *8 (7th Cir. July 19, 2018). If the ALJ finds a treating source opinion does not meet the test for controlling weight, he must decide how much value it does have, considering a checklist of factors including the treatment relationship's length, nature, and extent; the opinion's supporting explanation and consistency with other

19

evidence; and any specialty of the physician. Id. at *14; Campbell v. Astrue, 627 F.3d 299, 308 (7th Cir. 2010). The ALJ must give "good reasons" for discounting the opinions of a treating physician. Walker v. Berryhill, No. 17-3391, 2018 U.S. App. LEXIS 22597, at *17 (7th Cir. Aug. 15, 2018).

Plaintiff argues that the ALJ should have given greater weight to the reports from her various providers. (Pl.'s Br. at 17-21.) The Commissioner responds that plaintiff's argument amounts to a request that the court re-weigh the evidence. The Commissioner further contends that, because the treating providers' reports diverged in important respects, it was impossible for the ALJ to give controlling or significant weight to all of them. (Def.'s Br. at 6.) While the Commissioner's arguments have some force,[4] I cannot uphold the ALJ's decision on this record, as several of the reasons he provided for giving the reports little weight do not withstand scrutiny. That the reports do not aline in all their particulars is not, alone, a reason to reject them. See Tenhove v. Colvin, 927 F. Supp. 2d 557, 572 (E.D. Wis. 2013) (explaining that a treating source report may contain several different medical opinions, which the ALJ should evaluate separately).

The ALJ discounted Dr. Schubert's reports primarily because he attributed plaintiff's abdominal pain to Crohn's disease and/or endometriosis, but testing revealed her Crohn's disease to be mild, her gastroenterologist did not believe that Crohn's accounted for of all of her pain, and the record did not document a definitive diagnosis of endometriosis. That plaintiff's doctors could not identify a single, definitive cause of her pain does not mean that she

---

[4]Plaintiff's brief does at times read like an argument directed to the fact-finder regarding the weight that should be afforded the medical opinions under the checklist factors, rather than a critique of the reasons the ALJ actually gave. And, the conflicts between the various reports could provide a basis for declining to give any one of them controlling weight.

did not experience severe pain. The record documents numerous hospitalizations for abdominal pain, nausea, and vomiting, for which she received IV fluids and pain medication.[5] (E.g., Tr. at 1091,1095, 1098-99, 1408, 1424-25, 1402, 1103, 1382, 1376, 1366, 1360.) Her doctors also prescribed a variety of strong medications in an attempt to alleviate her symptoms, including Remicade and Entocort for Crohn's disease, Oxycodone for abdominal pain, and Reglan for nausea. (E.g., Tr. at 780, 782, 787, 1188.) The ALJ failed to consider whether the numerous hospitalizations supported Dr. Schubert's opinions. It seems unlikely plaintiff would have sought – and her doctors provided – this level of treatment had her symptoms, whatever their specific cause, been mild. See Carradine v. Barnhart, 360 F.3d 751, 755 (7th Cir. 2004).[6]

The ALJ discounted Dr. Ramanujam's opinions because, at one point in April 2015, the doctor noted plaintiff's Crohn's disease was under excellent control; the January 2016 endoscopy revealed findings consistent with "very mild" Crohn's disease; and Dr. Ramanujam did not believe that Crohn's accounted for all of plaintiff's abdominal pain. But Crohn's disease

---

[5]The Commissioner notes that the hospital visits generally occurred in 2015 and 2016, and thus do not demonstrate continuous disability from September 2008. (Def.'s Br. at 7-8.) She further notes that a claimant cannot manufacture a disability claim simply by going to the doctor as often as possible. (Def.'s Br. at 8.) That this evidence may not support an onset date as early as plaintiff alleged does not mean it should be ignored. Further, this evidence of frequent hospitalizations is surely relevant to plaintiff's ability to sustain regular, full-time work without excessive absences.

[6]The Commissioner argues that the ALJ was obliged to reject plaintiff's allegations of severe abdominal pain (and Dr. Schubert's opinion to the extent it rested on such allegations) because those symptoms could not be attributed to a severe medically determinable impairment. (Def.'s Br. at 3-5, 7.) I do not read the decision as making such a finding. See Shauger v. Astrue, 675 F.3d 690, 695 (7th Cir. 2012) ("Our review is confined to the rationales offered by the ALJ[.]"). The ALJ found plaintiff's Crohn's and IBD to be severe impairments, which could reasonably be expected to produce symptoms of the type alleged. He found the severity of her alleged symptoms inconsistent with the medical evidence, but he did not reject the medical foundation for those symptoms.

may cause periodic flare-ups, as plaintiff's numerous hospitalizations suggest; that she was asymptomatic at times does not mean she could sustain regular, full-time work. See Bauer v. Astrue, 532 F.3d 606, 609 (7th Cir. 2008). Nor does the record suggest that Dr. Ramanujam doubted the severity of plaintiff's abdominal symptoms, even though he could not relate them (exclusively) to Crohn's. He continued to explore other causes, including "visceral hypersensitivity." (Tr. at 1381, 779.)

In discounting Dr. Kiahni's opinion, the ALJ reasonably noted that at the time he completed the report Dr. Kiahni had been treating plaintiff for less than two months, and that he left much of the form blank. However, the ALJ also stated that Dr. Kiahni's credentials were not clear from the medical source statement he completed. Dr. Kiahni listed his medical specialty as "GI." (Tr. at 1453.) The ALJ could have also consulted the medical records, which showed that Dr. Khiani saw plaintiff on referral from Dr. Schubert, completing a physical exam and a colonoscopy. (Tr. at 1445.)[7]

The ALJ discounted the opinion of Dr. Stuleanu, the pulmonologist, because he only treated plaintiff's COPD/asthma, and the record, in particular pulmonary function tests in September 2014 and December 2014 (which revealed normal results), indicated that her COPD/asthma did not result in significant limitations such that she would be absent two times per month or limited to part-time work. Dr. Stuleanu's notes indicate that plaintiff's symptoms waxed and waned, and that she experienced breathing problems "every several days." (Tr. at 974.) This evidence, which the ALJ did not mention in evaluating Dr. Stuleanu's report, could be seen as supporting the opinion regarding absences.

---

[7]This could be seen as nitpicking, but the matter must be remanded for other reasons as well.

22

Finally, the ALJ gave little weight to the opinion of Dr. Ramanujam's physician's assistant, Cynthia Koopmeiners,[8] because she did not provide an adequate explanation for the significant limitations she assessed and her opinion was not consistent with the medical evidence, including Dr. Ramanujam's April 2015 notation that plaintiff's Crohn's disease was under "excellent control," the January 2016 endoscopy showing "very mild" Crohn's disease, and the less severe limitations set forth in Dr. Ramanujam's earlier report. It was reasonable for the ALJ to consider the degree to which Koopmeiners explained her opinion and to note that Dr. Ramanujam was more qualified. As discussed above, however, Dr. Ramanujam did not doubt plaintiff's symptoms, even if he could not directly attribute them to Crohn's; the same appears to be true of Koopmeiners.[9]

The ALJ also relied on the state agency consultants in determining RFC, but such opinions do not by themselves suffice to reject a treating source report. See Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003). It is also worth noting that those doctors did not have the benefit of reviewing the treating source reports or the substantial medical evidence created after they weighed in on plaintiff's condition. The matter must be remanded.

_____

[8]Because Koopmeiners does not qualify as an "acceptable medical source," her opinion could not receive controlling weight. Nevertheless, ALJs are supposed to evaluate such opinions under the same checklist of factors. See, e.g., Deleon v. Colvin, No. 14-C-82, 2015 U.S. Dist. LEXIS 96807, at *3 (E.D. Wis. July 23, 2015) (citing SSR 06-3p).

[9]Plaintiff also takes issue with the ALJ's evaluation of Dr. Ovide's report. She argues that his opinion was supported by the objective medical evidence, which documented her receipt of counseling and medications. (Pl.'s Br. at 20.) However, she does not explain how the ALJ erred in crediting parts of Dr. Ovide's report and rejecting others. Merely pointing to evidence that could support a different conclusion does not suffice, as the court does not re-weigh the evidence. In reply, plaintiff argues that Dr. Ovide's report was entitled to controlling weight (Pl.'s Rep. Br. at 6), but he is not a treating source. In any event, because the matter must be remanded for other reasons, plaintiff may on remand raise the issue of the weight properly given Dr. Ovide's opinions.

## B.     Plaintiff's Statements

The Commissioner's regulations set forth a two-step test for evaluating the credibility of a claimant's statements regarding her symptoms.  First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  SSR 16-3p, 2016 SSR LEXIS 4, at *5.  Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work.  Id. at *9. If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, used for relief of the symptoms; other measures the claimant uses to relieve the symptoms; and any other factors concerning the claimant's functional limitations due to the symptoms. Id. at *18-19.  The court will overturn an ALJ's adverse credibility determination if it is unsupported by substantial evidence or rests on legally improper analysis.  Lambert, 2018 U.S. App. LEXIS 20040, at *17.

Plaintiff begins her argument by analyzing the various factors (Pl.'s Br. at 21-22), but this sort of argument is properly directed to the ALJ.  The court reviews the reasons provided by the ALJ, rather than determining credibility in the first instance.

Here, the ALJ followed the two-step process, finding that plaintiff's impairments could reasonably be expected to cause symptoms of the types alleged, but that plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms were inconsistent with

the medical evidence and other evidence in the record. In support of this conclusion, the ALJ noted that objective medical testing showed no more than mild abnormalities, physical exams revealed largely normal findings, and plaintiff's daily activities suggested a greater level of functioning than she had alleged.

The ALJ appeared to place the greatest weight on the objective medical evidence. As the Seventh Circuit has noted, however, "an ALJ cannot disregard subjective complaints of disabling pain just because a determinable basis for pain of that intensity does not stand out in the medical record." Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009). As discussed above, plaintiff's doctors struggled to identify the cause of plaintiff's severe abdominal pain; while it was reasonable for the ALJ to discuss those difficulties, it provided no basis for rejecting her claims, particularly when those doctors continued to accept her statements and treat her symptoms. See Parker v. Astrue, 597 F.3d 920, 922 (7th Cir. 2010) ("As countless cases explain, the etiology of extreme pain often is unknown, and so one can't infer from the inability of a person's doctors to determine what is causing her pain that she is faking it."); see also Carradine, 360 F.3d at 755 (noting "the improbability that [the claimant was] a good enough actress to fool a host of doctors and emergency-room personnel into thinking she suffers extreme pain; and the (perhaps lesser) improbability that this host of medical workers would prescribe drugs and other treatment for her if they thought she were faking her symptoms").[10]

And, while it is appropriate for an ALJ to consider a claimant's daily activities, he cannot disregard a claimant's limitations in performing such activities. Moss, 555 F.3d at 562. As

---

[10]Plaintiff also received a variety of treatments for her neck and back pain, including injections, nerve blocks, medications, therapy, a TENS unit, and chiropractic. (E.g., Tr. at 434, 752, 749, 746-47, 549-50, 739, 544-45, 542, 538.)

discussed above, plaintiff in both her pre-hearing reports and her hearing testimony alleged significant limitations in performing chores like cleaning and shopping. (Tr. at 56, 262.) Further, to the extent that the ALJ relied on an early report on this issue, he should consider the possibility that plaintiff's condition worsened, as she seemed to indicate at the hearing. (Tr. at 56-57.)

## IV. CONCLUSION

The Commissioner argues that, even if the ALJ erred in evaluating the treating source reports, I should affirm the denial of the DIB claim because all of those reports were prepared after the date last insured. (Def.'s Br. at 2-3.) In reply, plaintiff notes that she received significant treatment for her various impairments prior to September 30, 2013; that Dr. Ovide prepared his report less than two moths after that date; and that some of her providers treated her prior to the date last insured, and those who didn't had access to her medical records. (Pl.'s Rep. Br. at 1-3.) While the evidence of disability does appear to be stronger after the date last insured, factual disputes over a claimant's alleged onset date are properly addressed by the ALJ, not the court.

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and this matter is remanded for further proceedings consistent with this decision. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 27th day of August, 2018.

/s Lynn Adelman
LYNN ADELMAN
District Judge